UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | No. 5:17–CR–381(1)–DAE |
| | § | |
| vs. | § | |
| | § | |
| CARLOS I. URESTI, | § | |
| | § | |
| Defendant. | § | |

ORDER DENYING DEFENDANT'S MOTION FOR NEW TRIAL

On March 8, 2018, Carlos I. Uresti ("Defendant" or "Uresti") timely filed a Motion for New Trial.  (Dkt. # 328.)  On March 20, 2018, the United States of America (the "Government") timely filed a response.  (Dkt. # 331.)  Pursuant to Local Rule CV-7(h), the Court finds this matter suitable for disposition without a hearing.  After careful consideration of the memoranda filed in support of and in opposition to the motion, the Court—for the reasons that follow—**DENIES** Defendant's Motion for New Trial.  (Dkt. # 328.)

BACKGROUND

On May 16, 2017, Defendant was charged in a twenty-two count indictment with co-defendants Gary L. Cain ("Cain") and Stanley P. Bates ("Bates").  (Dkt. # 3.)  Defendant was specifically charged with Wire Fraud, in violation of 18 U.S.C. § 1343; Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349; Conspiracy to Launder Money Instruments, in violation of

1

18 U.S.C. § 1956(h); Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity, in violation of 18 U.S.C. § 1957 ("Count 11"); Securities Fraud, in violation of 15 U.S.C. §§ 78j(b), 78ff, 240.10b-5, and 18 U.S.C. § 2; and Unregistered Securities Broker, in violation of 15 U.S.C. §§ 78o(a)(1) & 78ff ("Count 22").  (See id.)

On January 22, 2018, the matter proceeded to trial.  On February 22, 2018, the jury returned a verdict of guilty on all counts.  On March 8, 2018, Defendant timely moved for a new trial on five grounds: (1) the Court's "comments," made outside the presence of the jury, were "highly published" and "highly prejudicial" so as to have "likely biased the jury"; (2) the Court's instruction on "Deliberate Ignorance" was improper; (3) the Court's instruction on Count 11 was contrary to law; (4) the Court's instruction on Count 22 was contrary to law; and (5) the Court erred in disqualifying Defendant's counsel of choice, Mikal Watts ("Watts").  (Dkt. # 328.)

## LEGAL STANDARD

Motions for new trial are governed by Rule 33, which allows the Court to vacate a judgment and grant a new trial "if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  The focus of a motion for new trial is whether the weight of the evidence supports the verdict or an error was committed that

"substantially affects the rights of the accused." United States v. Simms, 508

F. Supp. 1188, 1202 (W.D. La. 198); Tibbs v. Florida, 457 U.S. 31, 42 (1982).

When considering a motion based on the evidence submitted at trial,

rather than newly discovered evidence, "[t]he trial judge may weigh the evidence

and assess the credibility of the witnesses." United States v. Arnold, 416 F.3d 349,

360 (5th Cir. 2005) (internal citations omitted).  Deference is given to the district

court because it actually observed the demeanor of the witnesses and their impact

on the jury.  United States v. Wall, 389 F.3d 457, 466 (5th Cir. 2004);

United States v. O'Keefe, 128 F.3d 885, 893 (5th Cir. 1997).  However, such

motions "must be reviewed with great caution," United States v. Smith, 804 F.3d

724, 734 (5th Cir. 2015) (quoting United States v. Piazza, 647 F.3d 559, 565 (5th

Cir. 2011)), as "it is not the role of the judge to sit as a thirteenth member of the

jury." O'Keefe, 128 F.3d at 898.

The Fifth Circuit has "stressed that motions for new trial are generally

disfavored, see United States v. Eghobor, 812 F.3d 352, 363 (5th Cir. 2015), and

that district courts have wide discretion with respect to Rule 33 motions,

see United States v. MMR Corp., 954 F.2d 1040, 1047 (5th Cir. 1992) (citing

United States v. Simmons, 714 F.2d 29, 31 (5th Cir. 1983))." United States v.

Mahmood, 820 F.3d 177, 190 (5th Cir. 2016).  Ultimately, a motion for new trial

should not be granted "unless there would be a miscarriage of justice or the weight

3

of the evidence preponderates against the verdict." Wall, 389 F.3d at 466 (citing

O'Keefe, 128 F.3d at 898).

DISCUSSION

I.   Press Coverage of the Court's Rulings

Defendant argues that the Court, throughout the course of the

four-week trial, "made a multitude of public statements" that were "heavily

biased" against Defendant's presumed innocence.  (Dkt. # 328 at 7.)

Given the nature of Defendant's arguments, a short review of basic

jurisprudence seems appropriate.  During the course of trial, a district court is

empowered and compelled to make rulings or orders[1] regarding the matter pending

before it.  Indeed, a court speaks through the language of its rulings and orders,

which are distinct from "public statements."  While courts often enter written

orders, courts frequently also enter orders orally or "from the bench," as it is

colloquially termed.  Regardless of how an order is made, the court should state all

findings and explain the basis for its decision to maintain a clear record for the

benefit of the parties and the appellate court.  Doing so imbues fairness to the

litigants and intelligibility on review.  See generally 56 Am. Jur. 2d Orders, §§ 42,

51, 52.

---

[1] While the law makes distinctions between rulings and orders, the distinction is
without a difference here.

It is with this in mind that the Court ruled from the bench at the pre-trial conference on several motions in limine, and then later ruled at trial on Defendant's motions for acquittal and proposed jury instructions.  Each time, the Court stated its findings on the record and explained the basis for its decision.  Notably, all the rulings at issue were made outside the presence of the jury.

On review, in determining whether the court overstepped its bounds of judicial neutrality, the defendant must show that judicial remarks are both substantial and prejudicial.  United States v. Legette, 992 F.2d 324, 325 (5th Cir. 1993); United States v. Glenn, 15 F.3d 179, 182 (5th Cir. 1994) (citing United States v. Lance, 853 F.2d 1177, 1182 (5th Cir. 1988)).  The reviewing court considers the remarks "in the context of the trial as a whole."  Legette, 992 F.2d at 325.

Defendant now attempts to take these rulings, conveniently cherry-picked and out of context, and misconstrue the record.  The record, viewed as a whole, is perfectly clear that the Court made neutral and tailored orders on the matters before it.  For example, in the newspaper articles covering the pre-trial conference, the Court is quoted as reading from a document filed by the Government prior to ruling on a motion in limine.  The Court was not making a comment on the guilt or innocence of Defendant.  This was clear at the time the

ruling was made, and it is clear in the article.  To insinuate otherwise is a misreading of the article, at best, and grossly misleading, at worst.

In the other newspaper articles, which covered the Court's ruling on Defendant's motion for acquittal at the close of the Government's case in chief, the Court is quoted as saying that there is "telling evidence" against Defendant.  The Court proceeded to recount the evidence the Government had put on, found the Government had at least met its burden of proof to ensure due process of law, and denied the motion for acquittal.  In doing so, the Court also made it clear that the law requires the Court to view the evidence in a light most favorable to the Government.  At the conclusion of the ruling, the Court clearly said "I'm not saying the defendants are guilty . . . It is up to the jury to decide."

The motion for acquittal—and the ruling denying the motion—are common in criminal cases.  A motion for acquittal tests the legal sufficiency of the Government's evidence to sustain a verdict.  In other words, it "essentially addresses 'whether the government's case [is] so lacking that it should not [be] submitted to the jury.'"  Musacchio v. United States, 136 S. Ct. 709, 715 (2016).  Here, the Court expressly did not rule on the guilt or innocence of Defendant, but on whether the Government had set forth enough evidence to proceed through trial.

The last tranche of newspaper articles covered the Court's ruling and explanation of the proposed commingling instruction, and whether the instruction

was merited by the evidence at trial.  In explaining why the instruction would not

be given to the jury, the Court made no determination of Defendant's guilt; instead,

the Court found that the evidence offered at trial did not support a finding of

"clean" funds and thus Defendants were not entitled to a commingling instruction.

It is clear, based on the context of trial as a whole, that the Court did

not wade beyond its bounds of judicial neutrality in ruling on the matters before it.

A careful review of the record will reveal that the Court's rulings were measured,

tailored to the issues, and not in any manner inflammatory.  The Court made

efforts to maintain a courtroom of dignity and justice.  In doing so, the Court took

caution to rule on legal issues outside the presence of the jury.  But given the

nature of a public trial, particularly one involving a sitting state senator, its rulings

were in front of the public and the media.  Inevitably, many of the Court's rulings

were covered and reported on in local media.  The Court has no control—nor

should it—over a newspaper's first amendment right and duty in covering issues of

public concern.  See Turner v. Lieutenant Driver, 848 F.3d 678, 688 (5th Cir.

2017) (quoting In re Express-News, 695 F.2d 807, 808 (5th Cir. 1982)

("[N]ews-gathering is entitled to first amendment protection, for 'without some

protection for seeking out the news, freedom or the press could be eviscerated.'")

(quoting Branzburg v. Hayes, 408 U.S. 665, 681 (1972)).

When there is an abundance of news coverage in a high-profile case,

such as this one, the Court's usual remedy is to admonish the jury to heed the

Court's instruction in not reading the news coverage until after the verdict has been

returned. See Skilling v. United States, 561 U.S. 358, 380–81 (2010) (citing

Reynolds v. United States, 98 U.S. 145, 155–56 (1879) ("[E]very case of public

interest is almost, as a matter of necessity, brought to the attention of all the

intelligent people in the vicinity, and scarcely any one can be found among those

best fitted for jurors who has not read or heard of it, and who has not some

impression or some opinion in respect to its merits.")); see also United States v.

Bermea, 30 F.3d 1539, 1559 (5th Cir. 1994) ("The judge did instruct the jury at the

outset and occasionally throughout the trial not to read or listen to *any* media

accounts of the case, an instruction we have favored . . .") (emphasis in original).

This Court did exactly that.  Indeed, the Court so admonished the jury

almost every day of trial.  In addition to the regular admonishments throughout

trial, the Court instructed the jury not to make assumptions on the guilt or

innocence of Defendant based on anything the Court did or said during the trial

and not to investigate the case on the internet or in the news while deliberating.

(Dkt. # 312 at 5, 52.)  Without a showing of bias or impartiality, the Court fulfilled

its duty in instructing the jury.  See United States v. Cessa, 785 F.3d 165, 183 (5th

Cir. 2015) (quoting <u>Zafiro v. United States</u>, 506 U.S. 534, 540 (1993) ("[J]uries are presumed to follow their instructions[.]")).

For these reasons, the Court finds that a new trial is not merited on these grounds.[2]

## II. Deliberate Ignorance Instruction

Defendant next contends that the Court erred in giving the jury the "Deliberate Ignorance" instruction because (1) no evidence was entered at trial to support the instruction, and (2) the instruction impermissibly lowered the Government's burden to prove specific intent as to each count.  (Dkt. # 328 at 2–7.)  The Court addresses each argument in turn.

### A. The Deliberate Ignorance Instruction was Warranted

As a general rule, the court "may not instruct the jury on a charge that is not supported by the evidence."  <u>Cessa</u>, 785 F.3d at 185 (quoting <u>United States v. Mendoza-Medina</u>, 346 F.3d 121, 132 (5th Cir. 2003)).  In determining

---

[2] Given the vital role that a free press plays in our democratic system of government, it is axiomatic that open public trials have been a hallmark of the judiciary from the beginning of our republic.

Were the arguments of counsel to be given any weight at all it would require federal district courts to do one of three things: (1) issue an order in every "high profile" case banning the press from printing any news stories about the trial; (2) require the press to submit any articles it wishes to publish about the case to the Court for review and censorship prior to publication; or (3) close the courtroom to the public and press, thus preventing the press from covering the trial.  All three of these measures are patently unconstitutional given that the justification for taking them is that the jury *might* ignore a Court's order to avoid media coverage and thus be improperly influenced.

whether the "evidence sufficiently supports a particular jury instruction," the evidence and all reasonable inferences drawn therefrom are viewed "in the light most favorable to the Government."  Id. (internal citations and quotations omitted).

A deliberate ignorance instruction "is warranted when a defendant claims a lack of guilty knowledge and the proof at trial supports an inference of deliberate ignorance."  United States v. Gibson, 875 F.3d 179, 198 (5th Cir. 2017) (quoting United States v. Brooks, 681 F.3d 678, 701 (5th Cir. 2012)).  Under the second prong, an inference of deliberate ignorance is supported when "the evidence shows (1) subjective awareness of a high probability of the existence of illegal conduct, and (2) purposeful contrivance to avoid learning of the illegal conduct."  United States v. St. Junius, 739 F.3d 193, 205 (5th Cir. 2013) (internal quotation and citation omitted).   Both prongs were clearly satisfied here.

   i. Defendant was Subjectively Aware of a High Probability of the Existence of Illegal Conduct

The first part of the inquiry "protects a defendant from being convicted for what he *should* have known" as the instruction is only permitted "when the Government presents facts that support an inference that the particular defendant subjectively knew his act to be illegal[.]"  United States v. Lara-Velasquez, 919 F.2d 946, 952 (5th Cir. 1990) (emphasis in original).  In addition to direct evidence of Defendant's subjective awareness, evidence of

"[s]uspicious behavior may be sufficient to infer subjective awareness of illegal conduct."  United States v. Wofford, 560 F.3d 341, 353 (5th Cir. 2009).

Throughout trial, Defendant maintained that he lacked guilty knowledge.  Indeed, this was the crux of Uresti's defense.  Defendant consistently argued or attempted to elicit facts to support his argument that he was not part of the inner circle of fraudsters, never knew about the cooked books or the Ponzi scheme, and generally did not know Bates was stealing investors' funds.  However, to recycle a used phrase, there was "telling evidence" that Uresti was subjectively aware of the illegal on-goings at Four Winds.  First, the Government presented evidence at trial that demonstrated the atmosphere at Four Winds was rife with signs of illegality.  Additionally, the Government introduced evidence at trial that several people specifically warned Defendant about Bates' questionable character and highly suspicious business practices.  For instance, Margarito Alonzo, who worked with Uresti to find investors for Four Winds, testified that he told Uresti that Bates was "shady" and that Uresti would need to "watch the money" to protect the business at Four Winds.  Similarly, Alexander Begum, an attorney and a potential investor Uresti tried to recruit, told Uresti that Bates was a "con man" and to "not walk but run away" from Four Winds.  Such evidence tends to support the inference that Uresti was subjectively aware of a high probability of the existence of illegal conduct.

11

In addition to the specific warnings, the Government introduced evidence at trial that supported the clear inference Uresti was subjectively aware that financial documents were being altered and the accuracy of such were highly suspicious.  For example, the Government presented emails between Uresti and Bates demonstrating that the Four Winds operating account had increased from $2.4 million dollars to $18,798,896.68 dollars within a matter of five days without any significant event justifying the increase.  Additionally, testimony at trial illuminated that Bates had ordered Eric Nelson, a cooperating witness, to alter a real bank statement.  The real statement showed only $98,896.68 in the account, but Nelson forged the statement by adding a "18,7" in front of the existing balance—resulting in a bank statement that touted an account balance of $18,798,896.68.  The Government offered evidence that Uresti, despite the unexplained significant increase in purported funds, then passed the altered bank statement on to investors.  Moreover, the Government presented evidence that Bates emailed the Four Winds' balance sheets to Uresti.  Despite the highly suspicious documentation, several of the Government's witnesses testified that Uresti never asked about Four Winds' finances or the discrepancies.

The Government also introduced evidence that Bates routinely lied during investor pitches.  Bates would name-drop celebrities he claimed had invested into the venture, over-state the amount of capital that Four Winds

maintained, and outright lie that he had invested his own money into Four Winds. The Government's witnesses testified that Uresti would regularly attend the pitches and appeared embarrassed when Bates performed his Four Winds song and dance. The Government's evidence, however, showed that Uresti never publicly questioned Bates' habitual lying, the accuracy of the pitches, or the legality of Four Winds' operations.  Instead, rather than questioning the legitimacy of the scheme, the Government offered evidence at trial that Uresti also lied to investors about how he had personally invested his own money, even going as far as touting his bank account statement to others, when in fact he invested nothing in the venture. All of this while Uresti allowed himself to be marketed to investors as Four Winds' "General Counsel."

The evidence compels a finding that Uresti was subjectively aware of the illegal conduct surrounding Four Winds.

ii.   Defendant Purposefully Contrived to Avoid Learning of the
Illegal Conduct

The second inquiry looks to whether the defendant "engaged in purposeful contrivance to avoid learning of the illegal conduct."  St. Junius, 739 F.3d at 205.  "The defendant's purposeful contrivance to avoid guilty knowledge may be established by direct or circumstantial evidence." Lara-Velasquez, 919 F.2d at 951.  "Courts [ ] have determined that the circumstances of the defendant's involvement in the criminal offense may have

13

been so overwhelmingly suspicious that the defendant's failure to question the suspicious circumstances establishes the defendant's purposeful contrivance to avoid guilty knowledge." Id. (citing cases holding the same). When analyzing the second prong, the Court must evaluate the sufficiency of the evidence as it relates to Defendant's subjective awareness and his deliberate avoidance of the illegal business practices at Four Winds.

Defendant argues there is no evidence to show that he took "deliberate action to avoid knowing" Bates was stealing or misusing investor funds. (Dkt. # 328 at 4.) However, Defendant's argument is contrary to the evidence offered at trial. In fact, as discussed above, an abundance of evidence was presented at trial that Defendant continuously failed to question the suspicious ongoings at Four Winds. In effect, Defendant's *modus operandi* amounted to a perpetual emanation of "Don't tell me, I don't want to know." See Lara-Velasquez, 919 F.2d at 951. Laura Jacobs, a cooperating witness and the Four Winds bookkeeper, testified that Defendant never asked her about the finances or altered bank statements, nor asked to see financial documents. Similarly, any time investors had questions about forthcoming payments, Uresti would direct them to Jacobs for answers. This was despite the fact that Uresti was Four Winds' general counsel and touted having an active investment in the venture. Thus, as the person charged with ensuring Four Winds was acting within the confines of the law, Uresti never inquired into the

14

highly suspicious and obvious red flags of illegality and questionable ethics that were so entrenched at Four Winds.

On the whole, the evidence clearly showed that Defendant made a conscious and deliberate effort to avoid any knowledge of the scheme at Four Winds and chose to remain publicly ignorant lest he was ever caught.  See id. Because the evidence offered at trial satisfies both prongs, the Court finds that there was more than sufficient evidence to support the deliberate ignorance instruction and that a new trial is not merited on this ground.

B.  The Deliberate Ignorance Instruction Did Not Lower the Government's Burden to Prove, Beyond a Reasonable Doubt, the Specific Intent Element of Each of the Crimes

Next, Defendant argues that the Deliberate Ignorance instruction lowered the Government's burden of proof.  Citing the Supreme Court's opinion in Global-Tech Appliances, Inc. v. SEV S.A., 563 U.S. 754 (2011), Defendant argues that the Court's instruction "included a standard that . . . permitted conviction based on recklessness or negligence rather than knowledge, . . . and violated Defendant's right to proof beyond a reasonable doubt" as to each of the specific intent elements in the crimes charged.  (Dkt. # 328 at 5.)  The Fifth Circuit, however, has routinely foreclosed this argument.

The Fifth Circuit has "affirmed time and again" that the Fifth Circuit Pattern Jury Instruction for Deliberate Ignorance under Global Tech Appliances is

a "correct statement of the law," Gibson, 875 F.3d at 196–97 (citing Brooks, 681 F.3d at 702–03; United States v. Hunter, 628 F. App'x 904, 906–07 (5th Cir. 2015) (per curiam)), and the instruction "does not lessen the government's burden to show, beyond a reasonable doubt, that the knowledge of the elements of the crimes have been satisfied." Gibson, 875 F.3d at 196–97 (5th Cir. 2017) (quoting United States v. Vasquez, 677 F.3d 638, 696 (5th Cir. 2012)). In fact, by its terms, the instruction tells the jury that they may not convict Defendant if his conduct was merely "negligent, careless, or foolish." (Dkt. # 312 at 19.)

Because the Fifth Circuit has repeatedly endorsed the "deliberate ignorance instruction[ ] in fraud and conspiracy cases just like this one," Gibson, 875 F.3d at 197 (citing United States v. Brown, 871 F.3d 352 (5th Cir. 2017); United States v. Sanjar, 876 F.3d 725 (5th Cir. 2017); Hunter, 628 F. App'x at 906–07); see also St. Junius, 739 F.3d at 204–06 (health care fraud conspiracy); and United States v. Demmitt, 706 F.3d 665, 674–77 (5th Cir. 2013) (conspiracy to launder monetary instruments, wire fraud, money laundering), the Court finds that a new trial is not merited on this ground.

III.    Commingling Instruction

        Uresti next argues that the Court and Government's error regarding Count 11 merits a new trial. [3]  (Dkt. # 328 at 13–14.)  First, Uresti, by incorporation of Cain's motion, contends that the Court erred in not giving the jury a "Loe" Instruction on the commingling of "clean" and "tainted" funds.  (Id.)  Second, Uresti argues that the Government failed to carry its burden of proof on Count 11.  (Id.)  The Court addresses each argument in turn.

        A.  The Evidence Did Not Support a Commingling Instruction

        Again, the court "may not instruct the jury on a charge that is not supported by the evidence."  Cessa, 785 F.3d at 185 (5th Cir. 2015) (quoting Mendoza-Medina, 346 F.3d at 132).  In determining whether the "evidence sufficiently supports a particular jury instruction," the evidence and all reasonable inferences drawn therefrom are viewed "in the light most favorable to the Government."  Id. (internal citations and quotations marks omitted).  Here, Defendant argues that the Court erred by not giving a "Loe" instruction, that is—

---

[3] In his Motion for New Trial, Defendant "adopts and incorporates by reference all arguments made by Gary Cain in his Motion for Judgment of Acquittal (Dkt. # 327), including the fact that a new trial is warranted due to the Government's failure to meet their [sic] burden of proof[.]"  (Dkt. # 328 at 14.)  To the extent Uresti moves for acquittal on the issue of the sufficiency of evidence for Count 11, the Court denies the motion for the reasons set forth in Section III, *infra*.

instructing the jury on the law when there is evidence of commingled funds.[4]
(Dkt. # 328 at 14.)

When a Section 1957 offense involves an account in which "clean"
and "tainted" funds have been commingled, the Fifth Circuit Pattern Jury
Instructions direct district courts to United States v. Fuchs, 467 F.3d 889, 907 (5th
Cir. 2006).  See PJI § 2.77.  In Fuchs, the Fifth Circuit held that "[w]here the
financial transaction involves an account commingling both 'clean' and 'tainted'
funds, 'we have developed the rule that when the aggregate amount withdrawn
from [the] account . . . exceeds the clean funds, individual withdrawals may be said
to be of tainted money, even if a particular withdrawal was less than the amount of
clean money in the account."  467 F.3d at 907.

By its terms and the directive within the Pattern Jury Instruction, such
an instruction is not merited unless the "financial transaction involve[s] an account
commingling both 'clean' and 'tainted' funds."  467 F.3d at 907.  The question,
then, is whether any of the evidence at trial, viewed in the light most favorable to
the Government, supported a finding of clean funds and therefore merited the
instruction on commingling.

---

[4] Defendant refers to the commingling instruction as a "Loe" instruction based on
U.S. v. Loe, 248 F.3d 449, 467 (5th Cir. 2001).  However, the Fifth Circuit Pattern
Jury Instructions direct district courts to U.S. v. Fuchs, 467 F.3d 889, 907 (5th Cir.
2006).  Fuchs post-dates Loe, and has been affirmed as the correct law in U.S. v.
Cessa, 785 F.3d 165 (5th Cir. 2015).  Accordingly, the Court relies on Fuchs here.

Notably, in his motion for new trial, Uresti fails to direct the Court to any evidence in support of his argument.  The Court thus looks to Cain's motion for acquittal, which Defendant adopted and incorporated by reference.  (Dkt. # 328.)  Cain argues the Government failed to show that all the funds deposited into Four Winds' operational account were "tainted" or obtained through specified unlawful activity.  (Dkt. # 327 at 3.)  Specifically, Cain argues "the Government did not plead nor provide[ ] evidence that Dr. Zehr's or Mr. Swannie's investment funds were derived from and were containing fraudulent information."  (Id.)  The Court finds, however, that the evidence introduced at trial contradicts Cain's argument.

Andy McStay, as the representative for all investments made on Dr. Zehr's behalf, testified at trial that Bates falsely represented: (1) Four Winds' ability to procure sand directly from mines; (2) the company's existing contracts with mines; and (3) the company's financial stability.  When Dr. Zehr received payment from his investment, McStay testified that he and Dr. Zehr were misled to believe that the payment was the result of Four Winds' profits—when in reality, it was money from Denise Cantu's investment.

Similarly, Dan Swannie testified at trial that Bates lied to him about Four Winds' capabilities and overall financial health.  In addition to lying about the business, Swannie testified that Bates falsely states that he would be using his

own money to cover Four Winds' overhead and start-up costs.  Other Government witnesses testified that Swannie's return on his investment was not paid with true profits, but was instead paid with money from a new investment—namely, the money invested by the so-called Mexican investors.  At trial, Swannie testified he was not aware that Four Winds repaid him with money that other investor's had infused in the company.  Further, Swannie testified that, if he had known this, he would have divested from Four Winds.

It is clear from the evidence introduced at trial that there were no clean funds.  Bates, through false and/or fraudulent pretenses, defrauded Dr. Zehr and Swannie into investing into Four Winds, in addition to the other investors who were defrauded.  This necessarily means that all the funds injected into Four Winds' operating account were derived in furtherance of the fraud and therefore tainted.  Accordingly, the commingling instruction was not warranted by the evidence.  Thus, a new trial is not merited on this ground.

      B.  <u>The Evidence Offered at Trial Supported the Jury's Verdict</u>

Count 11 charged Defendant with violating 18 U.S.C. § 1957.  Defendant argues that no reasonable juror could have convicted him on Count 11 because the Government failed to prove that (1) Defendant has the requisite specific intent, and (2) the funds were derived from a "specified unlawful activity." (Dkt. # 328 at 15.)

20

"Money laundering consists of three elements: '(1) property valued at more than $10,000 that was derived from a specified unlawful activity, (2) the defendant's engagement in a financial transaction with the property, and (3) the defendant's knowledge that the property was derived from unlawful activity.'" United States v. Tyler, 626 F. App'x 511, 514–15 (5th Cir. 2015) (quoting Fuchs, 467 F.3d at 907 (citing United States v. Rodriguez, 278 F.3d 486, 490 (5th Cir.2002)).  "The knowledge element requires only proof that the defendant 'knew the funds were illicit and engaged in a financial transaction with them regardless.'"  Tyler, 626 F. App'x at 514–15 (quoting United States v. Alaniz, 726 F.3d 586, 602 n.6 (5th Cir. 2013) (internal quotations omitted)).  "Unlawfully" or "criminally derived property" is "property constituting, or derived from, proceeds obtained from a criminal offense," such as wire fraud.  See 18 U.S.C. §§ 1957(f)(2), 1956(c)(7)(A).

When considering a motion for new trial based on the sufficiency of the evidence, rather than newly discovered evidence, "the trial judge may weigh the evidence and assess the credibility of the witnesses in considering the motion." Arnold, 416 F.3d at 360.  The district court need not grant a new trial on evidentiary grounds unless "the weight of the evidence preponderates against the verdict."  United States v. Chapman, 851 F.3d 363, 381 (5th Cir. 2017) (quoting Wall, 389 F.3d at 466)).

At trial, the Government submitted evidence that Defendant deposited a $40,000 check into his own account that had been drawn on the Four Winds operational account.  As discussed above, the Government offered sufficient evidence to prove that the only source of the funds in the Four Winds operational account were fraudulent or "tainted" investment funds from the victim investors. Additionally, as discussed in Section II, *supra*, there was sufficient evidence to show that Defendant knew of the ongoing scheme to defraud.  Viewing the evidence in the light most favorable to the Government, the Court finds that the evidence supports the jury's verdict on Count 11.  Thus, a new trial is not merited on this ground.

IV.   <u>Unregistered Securities Broker Instruction</u>

Defendant further argues that the Court's Instruction Number 29— that is, the instruction regarding Count 22—improperly construed the "exclusively intrastate" language as a defense, rather than as an element of the crime, which Uresti contends the Government had the burden to prove.  (Dkt. # 238 at 12.) Defendant asserts a new trial is merited on this ground because the instruction as written "precluded the jury from being correctly instructed upon the entirety of the Government's burden of proof."  (<u>Id.</u>)  The Government notes, however, that the Court "did include language in [Instruction No. 29] concerning the 'intrastate exception'" and that "the instruction, taken as a whole, was a correct and accurate

recitation of the law." (Dkt. # 331 at 15.) The Court agrees, and finds that the

interests of justice do not require a new trial on this ground.[5]

   The statute at issue, 15 U.S.C. § 78o(a)(1) ("Section 78o(a)(1)"),

states that:

> [i]t shall be unlawful for any broker or dealer which is either a person
> other than a natural person or a natural person not associated with a
> broker or dealer which is a person other than a natural person (other
> than such a broker or dealer whose business is exclusively intrastate
> and who does not make sue of any facility or a national securities
> exchange) to make use of the mails or any means or instrumentality of
> interstate commerce to effect any transactions in, or to induce or
> attempt to induce the purchase or sale of, any security (other than an
> exempted security or commercial paper, bankers' acceptances, or
> commercial bills) unless such broker or dealer is registered in
> accordance with subsection (b) of this section.

15 U.S.C. § 78o(a)(1). Courts interpreting Section78o(a)(1) have gleaned the

following elements from the statute to establish a *prima facie* case for a violation

of Section 78o: "(1) an unregistered (2) broker or dealer (3) to make use of the

mails or any means or instrumentality of interstate commerce (4) to effect any

---

[5] The Court has already addressed this argument at length in its Order denying
Uresti's Motion to Dismiss Count 22 of the Indictment. (Dkts. ## 47, 102.) In his
Motion to Dismiss, Uresti argued that Count 22 failed to state an offense against
him because "the Government has failed to allege that [Uresti's] business is
anything other than 'exclusively intrastate,'" which Uresti asserted is a necessary
element under 15 U.S.C. § 78o(a)(1). (Dkt. # 47 at 1.) The Court found—as it
does here—that construing the "exclusively intrastate" language as an exemption,
and thus an affirmative defense for Defendant to prove, is consistent with the
Supreme Court's interpretation of a nearly identical statute. See SEC v. Ralston
Purina Co., 346 U.S. 119, 126 (1953); see also SEC v. Cont'l Tobacco Co. of S.C.,
463 F.2d 137, 157 (5th Cir. 1972) (applying Ralston in context of Section 77e).

transaction in, or to induce or attempt to induce the purchase or sale of, any security." <u>SEC v. Gibraltar Global Secs., Inc.</u>, No. 13 Civ. 2575, 2015 WL 10910362, at *3 (S.D.N.Y. Oct. 16, 2015), <u>adopting report and recommendation</u>, 2016 WL 153090 (S.D.N.Y. Jan. 12, 2016); <u>see also</u> <u>Energytec, Inc. v. Proctor</u>, 516 F. Supp. 2d 660, 674–75 (N.D. Tex. 2007) ("Section 15(a) of the Exchange Act, 15 U.S.C. § 78o, makes it unlawful for any broker or dealer to make use of the mails or any means of instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale or, any security . . . unless such broker or dealer is registered in accordance with the section." (internal quotations omitted)).

        The Court's Instruction No. 29 tracked the language of the statute and the relevant case law, explaining that for the jury to find Defendant guilty of violating Section 78o(a), the jury must be convinced that the Government proved each of the following elements beyond a reasonable doubt:

> *First*: that the defendant was acting as a broker, that is was engaged in the business of effecting transactions in securities for the account of others; and
>
> *Second*: that the defendant made use of the mails, wire transmissions, or a means or instrumentality of interstate commerce to either:
>
> > (a) Effect any transaction in any security; or
> >
> > (b) Induce or attempt to induce the purchase or sale of any security;

> *Third*: the defendant did so knowingly and willfully without first registering as a broker with the Securities and Exchange Commission.

(Dkt. # 312 at 46.)

Defendant argues that the Court should have construed the parenthetical language in Section 78o(a) as an element of the crime for the Government to prove.  (Dkt. # 328 at 14.)  Notably, however, Uresti does not cite a single case in his motion for new trial to support the contention that the Government bears the burden to prove that the exemptions do not apply.  (See id.) This makes sense given that allocating the burden of proof on the party not claiming the exemption—here, the Government—is pointedly contrary to long-established precedent.

While the Fifth Circuit has not addressed which party bears the burden of proof on the "exclusively intrastate" exemption under Section 78o(a)(1), the Supreme Court has addressed the burden of proof with respect to exemptions in the context of a nearly identical statute, 15 U.S.C. § 77e ("Section 77e").[6]  There, the Supreme Court clearly stated that the issuer who claims the benefit of an

_____

[6] 15 U.S.C. § 77e(a) states in relevant part: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly— (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."

exemption has the burden of proving entitlement to it.  <u>SEC v. Ralston Purina Co.</u>, 346 U.S. 119, 126 (1953); <u>see also</u> <u>SEC v. Cont'l Tobacco Co. of S.C.</u>, 463 F.2d 137, 157 (5th Cir. 1972) (applying <u>Ralston</u> in context of Section 77e).  Several courts have generally adopted this rule in the context of the Securities and Exchange Acts.  <u>See</u> <u>Sec. & Exch. Comm'n v. Arcturus Corp.</u>, 171 F. Supp. 3d 512, 531–34 (E.D. Tex. 2016) ("Once the SEC establishes its prima facie case, the burden shifts to Defendant to prove that the offer or sale falls under an exemption to the registration requirements." (citing <u>Cont'l Tobacco Co.</u>, 463 F.3d at 155)); <u>United States Sec. and Exch. Comm'n v. Kahlon</u>, 141 F. Supp. 3d 675, 678–79 (E.D. Tex. 2015) (same); <u>SEC v. StratoComm Corp.</u>, 2 F. Supp. 3d 240, 262 (N.D.N.Y. 2014) ("The party claiming the exemption must show that it is met[.]"), <u>aff'd sub nom</u>, <u>Sec. & Exch. Comm'n v. StratoComm Corp.</u>, 652 F. App'x 35 (2d Cir. 2016).

Accordingly, since an exemption constitutes a defense to the registration requirement, of which the defendant bears the burden of proof, it is axiomatic that the Government had no duty to overcome the defense beyond a reasonable doubt as part of its case in chief.  <u>See</u> <u>Smith v. United States</u>, 568 U.S. 106, 110 (2013) ("While the Government must prove beyond a reasonable doubt every fact necessary to constitute the crime with which [the defendant] is charged, [p]roof of the nonexistence of all affirmative defenses has never been

constitutionally required.") (internal quotations and citations omitted).  Thus the

Court's instruction to the jury that:

> [i]t is a defense that a broker or dealer whose business is exclusively
> intrastate and who does not make use of any facility of the mails, wire
> transmissions, or a means or instrumentality of interstate commerce is
> not liable for this crime[,]

was not erroneous.  (Dkt. # 312 at 48.)  Because the Court finds that the jury was

properly instructed as to Count 22, the Court denies Defendant's motion on this

ground.

V.    Disqualification of Mikal Watts

Finally, Defendant argues that the Court erred in disqualifying his

counsel of choice, Mikal Watts ("Watts").  (Dkt. # 328 at 13.)  Defendant has

raised this argument several times throughout the course of trial (see Dkts. ## 34,

44, 67, 77), and notably does not assert any new arguments here, but instead

simply cites back to his old motions (see Dkt. # 328 at 13).  This Court has already

reviewed the underlying disqualification order, finding that it was not clearly

erroneous.  (Dkt. # 86.)  The Court does not find differently today, and thus denies

Defendant's motion on this ground.[7]

---

[7] It should be noted that the evidence adduced at trial regarding Denise Cantu
affirmed the Court's pretrial ruling that a clear conflict of interest existed.  Had Mr.
Watts acted as Uresti's attorney, he would have been compelled to cross-examine
Cantu on issues regarding the underlying case, where Watts had represented her
and secured the settlement that was later invested into Four Winds.

<u>CONCLUSION</u>

For the reasons stated above, Defendant's Motion for New Trial is

**DENIED**.  (Dkt. # 328).

**IT IS SO ORDERED.**

**DATE:** San Antonio, Texas, April 5, 2018.

_____

DAVID ALAN EZRA
UNITED STATES DISTRICT JUDGE